**SIDLEY AUSTIN LLP**
Michael G. Burke
Brian J. Lohan (*Pro Hac Vice* Pending)
Andrew P. Propps
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300

*Counsel to the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
: 
In re: : Chapter 15
:
KARHOO INC. (in administration), *et al.*[1] : Case No. 16-13545 (___)
:
Debtors in a Foreign Proceeding. : (Joint administration pending)
:
---------------------------------------------------------------x

**VERIFIED PETITION FOR ENTRY OF AN ORDER RECOGNIZING**
**FOREIGN MAIN PROCEEDING AND GRANTING ADDITIONAL RELIEF**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Paul Cooper, in his capacity as the authorized foreign representative (in such capacity, the "Foreign Representative") of each of the Debtors in administrations (the "UK Proceedings") under English law, pursuant to the Insolvency Act 1986 (the "Insolvency Act"), by and through the undersigned counsel to the Foreign Representative, hereby submits this verified petition and motion (this "Verified Petition" and together with the Form of Voluntary Petition for each Debtor filed contemporaneously herewith, the "Petitions") pursuant to sections

---

[1] The chapter 15 debtors incorporated in England and Wales (collectively, the "UK Debtors"), along with the English Company Number of each UK Debtor, are: Karhoo Limited (in administration) (09318091) and Karhoo Technologies Limited (in administration) (09864120). The chapter 15 debtors incorporated in the United States (collectively, the "US Debtors"), along with the last four digits of each US Debtor's federal tax identification number, are: Karhoo Inc. (in administration) (2445) and Karhoo USA Inc. (in administration) (3852). The UK Debtors and the US Debtors are referred to herein, collectively, as the "Debtors." The mailing address of each of the Debtors (and registered office of each of the UK Debtors) is 26-28 Bedford Row, Holborn, London, WC1R 4HE, United Kingdom.

105, 350, 362, 1507, 1515–1517 and 1520–1522 of title 11 of the United States Code (the "Bankruptcy Code"), rule 5009(c) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules") and rule 5009-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Southern District of New York (the "Local Rules") for entry of an order recognizing each of the UK Proceedings as a foreign main proceeding pursuant to section 1517 of the Bankruptcy Code. In support hereof, the Foreign Representative respectfully represents as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(P). Venue is proper in this district pursuant to 28 U.S.C. § 1410.[2]

## BACKGROUND[3]

### I.     The Debtors' Business

2. The Debtors are part of a group of companies ("Karhoo") that offered a "ride comparison app" as an alternative to the Uber/Lyft "ride-sharing app" model. Instead of maintaining its own fleet of drivers and cars, Karhoo contracted with local dispatchers and fleet owners, providing customers with a choice of vehicles and prices through its mobile application.

---

[2] The Debtors' principal place of business in the United States is in this district, as are the US Debtors' principal assets in the United States: Karhoo Inc. has a receivable under a lease termination agreement with its landlord in Manhattan; the US Debtors are parties to contracts governed by New York law and with forum selection clauses specifying courts in Manhattan. Further, the US Debtors are defendants in a lawsuit brought in this District.

[3] Unless otherwise specified, the facts herein are taken from the *Declaration of Paul Cooper in Support of Verified Petition for Recognition of a Foreign Main Proceeding and Other Relief and First Day Pleadings* (the "Cooper Declaration") and the *Declaration of Phillip Taylor in Support of Verified Petition for Recognition of a Foreign Main Proceeding and Other Relief* (the "Taylor Declaration").

3. Founded in November 2014 in London, England, by Daniel Ishag (a resident of the United Kingdom), Karhoo is comprised of eight entities organized in five jurisdictions, as shown below:



The US Debtors are incorporated in Delaware. The UK Debtors and non-debtor Karhoo Holding Ltd (collectively, the "English Entities") are organized under the laws of England and Wales. Karhoo Asia Limited is organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, Karhoo Singapore PTE. LTD. ("Karhoo Singapore") is organized under the laws of the Republic of Singapore, and Karhoo Solutions Israel Ltd ("Karhoo Israel," and together with Karhoo Asia Limited and Karhoo Singapore, the "Asian Entities") is organized under the laws of the State of Israel. Each of the entities, other than Karhoo Inc., is a wholly owned direct or indirect subsidiary of Karhoo Inc. and each entity shown above it on the above chart.

4. A customer looking for a ride through the mobile app on her phone would potentially see several vehicles along with the fleet they belong to (such as Dial 7 or Carmel), the estimated time of arrival, and the fare; she could also filter by the fleet type (such as taxi, executive, or luxury) before choosing her ride. The intellectual property that enables this to take place – including Karhoo's electronic infrastructure, its mobile app, and the back-end software – is owned by one of the UK Debtors, as is its other intellectual property, such as its trademarks (collectively, the "Karhoo IP"). The Karhoo IP was first registered in England and Wales, and then in other jurisdictions, including the United States. The Karhoo IP was licensed by the UK Debtors to the other Karhoo entities, including the US Debtors.

5. In order to procure vehicles for its customers, Karhoo entered into approximately 700 contracts with fleet owners (the "Supplier Contracts") and approximately 21 contracts with dispatchers (the "Dispatch Contracts") in the cities in which it did business, primarily London and several other cities in England. Under the Supplier Contracts, the fleet owners made their fleets available to Karhoo's customers; the Dispatch Contracts allowed Karhoo to communicate customer instructions to those fleets through local dispatchers. The US Debtors entered into the majority of Karhoo's Supplier Contracts and Dispatch Contracts, but the business relationships with non-U.S. counterparties generally were with the English Entities. The Supplier Contracts and Dispatch Contracts generally are governed by the law of the place of business of the counterparty, including England, New York, France, and Singapore.

6. Karhoo accepted credit card payments from its customers through Stripe, which automatically paid fleet owners and dispatchers the amounts due to them (typically 90%) and the remainder to Karhoo; however, the Foreign Representative believes Karhoo owes an unknown amount under certain of the Supplier Contracts. Over 90% of Karhoo's revenue

4

originated in the United Kingdom, with the payments through Stripe being paid to Karhoo USA Inc.

7. In total, Karhoo employed approximately 200 employees, the vast majority of whom have been laid off or made redundant in recent weeks. Of those employees, approximately 100 were employed by the UK Debtors. Approximately 50 were employed by the US Debtors (about a dozen of whom resided in the United Kingdom and worked as part of Karhoo's global leadership), and the remainder were employed by the Asian Entities. Monthly payroll roughly followed the same distribution. As of November 9, 2016, the US Debtors owed approximately $375,428.31 to their employees, and the UK Debtors owed approximately $1,538,496.89 to their employees.

8. Karhoo's business and operations were directed out of London. Its executives – including its chief executive officer ("CEO"), chief financial officer ("CFO"), chief marketing officer ("CMO"), and chief technology officer ("CTO") – as well as the chairman of the board of directors are based in London. Karhoo's accounting team is primarily in the United Kingdom, including its global controller, its global accounts payable head, the bulk of its fraud team, its payments team, and the group head of financial projects. Karhoo's human resources functions, including the global head of human resources and the global technology recruiter, are also based in London. Karhoo's information technology systems are cloud-based, but those services are arranged by and billed to Karhoo Ltd. Recent meetings of the boards of directors of the US Debtors and the English Entities have been telephonic, with one director in England, one in Europe, and one in the United States.

9. On January 7, 2016, Karhoo Inc. entered into a 10-year lease for office space at 386 Park Avenue South, New York, New York. The lease commenced on July 15, 2016.

Annual rent was to be $859,584 for the first year, increasing over time to over $1.1 million for the tenth year. As security for Karhoo Inc.'s obligations under the lease, Karhoo Inc. delivered to its landlord a letter of credit issued by HSBC Bank USA, N.A. in the amount of $859,584 (the "HSBC L/C"), which was fully cash-collateralized by Karhoo Inc. Upon the Foreign Representative's appointment as Administrator, he undertook a negotiation to terminate the lease and surrender the premises to the landlord. Prior to filing these cases, he executed an agreement surrendering the leased office space to the landlord in exchange for the return of $60,000 of the HSBC L/C collateral.[4]

10.     Other than amounts owed to their employees, described *supra* ¶ 7, and to the Secured Noteholders, described *infra* ¶ 11, as of November 9, 2016, the US Debtors owed approximately $2,931,154.58 to their creditors. Other than amounts owed to their employees and affiliates, as of November 9, 2016, the UK Debtors owed approximately $4,411,925.52 to their creditors.[5]

## II.     The Debtors' Capital Structure/Events Leading to Administration

11.     The Debtors have no public securities. It is the Foreign Representative's understanding that the Debtors' (and Karhoo's) only funded debt is approximately $18 million in Secured Convertible Term Notes due March 11, 2017 (the "Secured Notes") under that certain Securities Purchase Agreement among Karhoo Inc., the Purchasers thereunder, and DNK USA, LLC as administrative and collateral agent (the "Agent") for the Purchasers dated October 11, 2016 (the "Securities Purchase Agreement"), of which debt the Administrators will confirm the validity in the normal course of their duties. Karhoo Inc. purportedly granted a security interest in its assets to the agent for the holders of the Secured Notes (the "Secured Noteholders"), of

---

[4] The return of the $60,000 has not yet occurred.

[5] In addition, non-debtor Karhoo Singapore owes approximately $261,000 to its creditors.

which security interest the Administrators also will be required to confirm the validity in the event that Karhoo Inc.'s assets are sold and distributions to creditors are effected. Karhoo USA Inc. guaranteed Karhoo Inc.'s obligations under the Securities Purchase Agreement. There are four purported Secured Noteholders:[6]

| Secured Noteholder | Domicile of Secured Noteholder | Amount |
|---|---|---|
| Hard Work Israel Holding Trust | Israel | $9,127,666.67 |
| Jeremy Coller | United Kingdom | $5,040,000.00 |
| DNK USA, LLC | Delaware, United States | $3,000,000.00 |
| Wottan Holdings Limited | Switzerland | $1,000,000.00 |

12.     A total of 100,691,318 shares of Karhoo Inc. are outstanding, the sale of which had generated approximately $33.65 million in capital for Karhoo, in six (6) rounds of sales.[7] 35.65% of the shares are held, directly or indirectly (including through Powerful Ace Ltd.), by Daniel Ishag. Other co-founders of Karhoo, all UK residents, hold 21.35%. The remaining 42.99% of the shares are held by several dozen investors.

13.     Since its founding, Karhoo aggressively marketed itself, seeking both a larger share of the market in the cities it operated in and a larger number of cities in which to operate. Karhoo expanded from its London roots to nine (9) other English cities, New York (where Karhoo was at a pilot stage), Paris, and Singapore, and had plans to operate in another twenty-nine (29) cities worldwide, including other major population centers in Europe and the United States, by the end of 2016. Karhoo expected to be in 400 cities by the end of 2020. This expansion and marketing would require significant amounts of capital.

14.     However, Karhoo encountered a number of difficulties that proved to be insurmountable. These difficulties included the misuse and misaccounting of promotional codes

---

[6] Counsel to the Foreign Representative provided the Agent and the Office of the United States Trustee with advanced drafts of the Foreign Representative's filings. To date, he is not aware of any objection to the relief being sought in connection with the filing.

[7] Certain financial press had reported a cash raise of $250 million; those reports appear to have been mistaken.

(often for rides of up to $40), which were given out indiscriminately, which users would often use for the most expensive trip possible, and which Karhoo permitted users to re-use. In October 2016, approximately 70% of Karhoo's bookings were using promotional codes. Similarly, in an effort to retain users, Karhoo was generous with its refunds and other compensation for poor experiences.[8] Karhoo also had problems with the fraud protections in its payment processing system, such as verifying a user's address or requiring an email address to set up an account, leading to the rejection of many credit card payments (at one point, reportedly reaching a 90% rejection rate).

15. Beginning around the beginning of October, many of Karhoo's employees began working without pay in an attempt to turn around the business. At the end of October, Karhoo missed payroll in both the United States and Israel; on November 6, 2016, Karhoo Israel had to put its employees in the Israeli R&D Center on notice of termination.

16. In the meantime, Karhoo actively was seeking an infusion of outside capital (in addition to the capital raised through the sale of the Secured Notes), with company representatives courting investors on multiple continents; by November 7, 2016, the focus was on one particular investor who was being provided reassurances about the state of Karhoo's business, and who would not have the opportunity to do due diligence. Karhoo's management expressed a willingness to put $600,000 into Karhoo if the investment were procured. However, Karhoo's operational difficulties made the investor wary, and on November 7, 2016, the investor declined to invest in Karhoo, leaving Karhoo with no alternative investor and insufficient funds with which to operate.

---

[8] In October 2015, Karhoo Inc. contracted with ModSquad Inc. ("ModSquad") to provide customer support services to Karhoo. On October 28, 2016, ModSquad commenced a breach of contract lawsuit against the Debtors in the United States District Court for the Southern District of New York, alleging that it is owed over $670,000 for services rendered through October 2016 and for the remainder of the term of a certain work order under the parties' contract.

8

17.     In the final week of Karhoo's operations, given Karhoo's high media profile, a number of press articles appeared commenting on, and speculating on the reasons for, its demise.  The Administrators intend to fulfill their statutory duties under the Company Directors Disqualification Act 1986 by investigating the Debtors' circumstances in the months leading up to the Debtors' entry into administration and submitting reports to the Department for Business, Energy, and Industrial Strategy of the UK Government.

### III.    The Administration

18.     In light of Karhoo's difficulties, on November 7, 2016, the boards of directors of the UK Debtors determined it was necessary to cease operations and enter administration so as to maximize the value of Karhoo's assets.  On November 9, 2016, as permitted by the Insolvency Act, the board of directors appointed Paul Appleton and Paul Cooper of David Rubin & Partners Ltd as administrators of both UK Debtors (in such capacity, the "UK Debtor Administrators").  Later that day, each of the UK Debtors filed a notice of appointment of an administrator in the Chancery Division of the High Court of Justice of England and Wales (the "English Court"), copies of which are attached as Exhibit A and Exhibit B to the Cooper Declaration (each, a "UK Debtor Notice of Appointment").

19.     As described in more detail in the Taylor Declaration, the directors were required to determine whether the UK Proceedings as to each Debtor would be main, secondary or territorial proceedings.  Under the Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings (the "EC Regulation"), the UK Proceeding as to any Debtor would be a "main" proceeding if that Debtor's COMI was within the United Kingdom.  *See* Taylor Decl. ¶¶ 12-15.

20.     In the board minutes memorializing the decision to appoint the UK Debtor Administrators and enter administration, the directors "noted that the Company's registered

9

office is in the United Kingdom, and in accordance with the presumption contained in Article 3(1) of the EC Regulation (absent any evidence to the contrary) were satisfied that its centre of main interests should be presumed to be and is in the United Kingdom." Cooper Decl. Ex. [Karhoo Limited Minutes] ¶ 6.3; *see also* Cooper Decl. Ex. [Karhoo Technologies Ltd Minutes] ¶ 6.3. The UK Debtor Notices of Appointment repeated this reason for COMI to be in the United Kingdom. *See* Cooper Decl. Exs. A and B.

21. The boards of directors of the US Debtors (which boards are identical with the boards of the UK Debtors) later determined that those entities are loss-making and insolvent on both a balance sheet and cash-flow basis, and could not continue their business in the current form. Therefore, in order to obtain protections under the Insolvency Act and to evaluate options for the best realization of the US Debtors' assets, the boards of directors of the US Debtors on November 16, 2016, determined to appoint the UK Debtor Administrators as administrators of each of the US Debtors as well (in such capacity, the "US Debtor Administrators" and, as administrators of all of the Debtors, the "Administrators"). On November 21, 2016, each of the US Debtors filed a notice of appointment of an administrator in the English Court, copies of which are attached as Exhibit C and Exhibit D to the Cooper Declaration (each, a "US Debtor Notice of Appointment," and, together with the UK Debtor Notices of Appointment, the "Notices of Appointment").

22. In the minutes of the meeting in which the boards of directors determined to appoint the US Debtor Administrators, they concluded that:

(a) The Group's Headquarters and the place where general supervision and management of the Company takes place is London, United Kingdom;

(b) The Company's place of strategic control is in the United Kingdom, with the CEO, CFO, CMO CTO and Chairman all being based in the United Kingdom;

10

(c) The Company's address for the purpose of the Securities Purchase Agreement . . . and associated documents, was notified to the parties to such agreements as 6th Floor, 55 Baker Street, London W1U 8EW;

(d) The purchasers and current holders of the Secured Convertible Term Notes issued pursuant to the Securities Purchase Agreement are based or resident in various places, including the United Kingdom, Monaco and the United States, and as such the majority of the creditors of the Company by value are not based in the United States;

(e) The Group's accounting function is in the United Kingdom, with the Group CFO, Group Financial Controller, Global AP head, most of the Fraud team, the payments team (PSP), and the Group Head of financial projects, all based in the United Kingdom;

(f) The Company's human resources functions are based in the United Kingdom;

(g) The Company's IT systems were provided by Karhoo Limited, which was based in the United Kingdom;

(h) The corporate identity and branding of the Group was created in and is largely associated with the United Kingdom;

(i) The recent board meetings have not been held in any particular place, with one director being in the United Kingdom, one in the United States, and one in Europe;

(j) Negotiations with the Company's main creditors, being the [Secured Noteholders], have however taken place from London, and as such those creditors were clearly able to ascertain the Company's place of strategic control as being in the United Kingdom; and

(k) In addition, over 90 per cent of the Group's turnover was generated in the United Kingdom.

Cooper Decl. Ex. [Karhoo Inc. Minutes] ¶ 6.3.[9]

23. Therefore, the directors of each Debtor concluded that the Debtor's center of main interests ("COMI") was in the United Kingdom, and in the US Notices of Appointment, the directors of the Debtors stated that "[n]otwithstanding that the company is incorporated under the laws of the State of Delaware, the place where the company conducts the administration of its

---

[9] The minutes of Karhoo USA Inc. differed slightly, including the addition to ¶ 6.3(d) that the Secured Convertible Term Notes were "guaranteed by Karhoo USA Inc." See Cooper Decl. Ex. [Karhoo USA Inc. Minutes] ¶ 6.3.

interests on a regular basis and is therefore ascertainable by third parties is in England." Cooper Decl. Ex. C; *see also* Cooper Decl. Ex. D. Therefore, for the purposes of the EC Regulation, the US Debtors' directors determined that the UK Proceedings also would be main proceedings with regard to the US Debtors.

24.     Under the Insolvency Act, the Administrators generally supplanted the directors of the Debtors in the management of the Debtors; the directors are restricted from taking any actions that could interfere with the Administrators' powers without prior consent of the Administrators. Upon their appointment, the Administrators were required to take custody or control of all the Debtors' property, and are required to manage the affairs, business and property of the Debtors in accordance with any proposals approved by their creditors (as described further in paragraph 24 of the Taylor Declaration), who are to be given notice of the Administrators' appointment and may have the opportunity to steer the administration through one or more creditors' meetings. The Administrators must comply with any directions given to them by the English Court in connection with any aspect of their management of the Debtors' affairs, business, or property.

25.     As described in more detail in the Taylor Declaration, the Administrators now act as agent of the Debtors and are granted broad statutory powers with regard to the assets and affairs of the Debtors. *See* Taylor Decl. ¶ 20; Taylor Decl. Ex. B. These powers are exercised subject to the ultimate supervision of the English Court, which has the power to take action with regard to the Debtors in the event that the Administrators are unable to have their proposals for achieving the purposes of the administration approved by a creditors' meeting or with regard to the Administrators in the event that they do not discharge their duties in accordance with the Insolvency Act or that they breach their duties to the Debtors and their creditors.

12

26. The Administrators marketed Karhoo's assets as a whole, believing that due to the interdependence of the Karhoo entities' operations, assets, and liabilities, their assets were likely worth more marketed as a unit rather than piecemeal, and selected a single winning bidder, Flit Technologies Limited ("Flit Technologies"). Flit Technologies is purchasing substantially all of the Debtors' assets, including the Karhoo IP (primarily owned by the UK Debtors) and the Supplier Contracts and Dispatch Contracts (primarily entered into by the US Debtors), in exchange for the payment of (i) $500,000 cash in consideration for the assets of the UK Debtors, (ii) ten percent (10%) of the equity in Flit Technologies in consideration for the assets of the US Debtors, and (iii) up to $500,000 cash essentially as cure payments to the counterparties under certain Supplier Contracts that Flit Technologies is assuming (the "Sale"). The Administrators anticipate the Sale closing prior to the end of 2016.

27. As described in more detail in the Taylor Declaration, a moratorium (broadly akin to the automatic stay under section 362 of the Bankruptcy Code) took effect upon the appointment of the Administrators, and it remains in effect. This moratorium prohibits the commencement of winding up proceedings in respect of the Debtors and prohibits the taking of steps to enforce security over the Debtors' property (wherever situated), and the institution or continuation of legal proceedings against the Debtors, without the consent of the Administrators or leave of the English Court. *See* Taylor Decl. ¶ 18.

**RELIEF REQUESTED**

28. Because the Foreign Representative believes it is possible that creditors or other third parties will take actions against the Debtors in the United States prior to a recognition hearing, the Foreign Representative, by separate motion, is seeking provisional relief under section 1519. By this Verified Petition, the Foreign Representative seeks entry of an order recognizing the UK Proceedings. Specifically, the Foreign Representative seeks an order:

  (a)  recognizing each of the UK Proceedings, pursuant to section 1517 of the Bankruptcy Code, as a foreign main proceeding, as such term is defined in section 1502(4) of the Bankruptcy Code;[10]

  (b)  recognizing the Foreign Representative as the foreign representative of each of the Debtors, as such term is defined in section 101(24) of the Bankruptcy Code;

  (c)  granting relief automatically and as of right upon recognition of each of the UK Proceedings as a foreign main proceeding pursuant to section 1520(a) of the Bankruptcy Code; and

  (d)  awarding the Foreign Representative such other relief as this Court may deem just and proper.

## BASIS FOR RELIEF REQUESTED

29. For the reasons set forth in the Memorandum of Law, the Court should enter the Proposed Recognition Order. The Foreign Representative meets the standards for obtaining the relief requested herein and otherwise satisfy the statutory requirements for recognition, scheme enforcement, entry of a final decree and related relief under chapter 15 of the Bankruptcy Code.

### A. Recognition of the UK Proceedings

30. Section 1517(a) of the Bankruptcy Code authorizes the Court to enter a final order, after notice and a hearing, recognizing a foreign proceeding if (i) such proceeding is a foreign main proceeding or a foreign nonmain proceeding, (ii) the foreign representative applying for recognition is a person or body and (iii) the application for recognition was properly filed in accordance with section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517(a). Section 1517(b) of the Bankruptcy Code further provides that a proceeding shall be recognized as a

---

[10] Although the Foreign Representative is confident that the UK Proceeding is a foreign main proceeding within the definition of section 1502(4) of the Bankruptcy Code, in an abundance of caution, the Petitioners reserve the right to argue, in the alternative, that the UK Proceeding is a foreign nonmain proceeding within the definition of section 1502(5) of the Bankruptcy Code and to seek appropriate relief under Bankruptcy Code section 1521 and any other applicable provision of the Bankruptcy Code.

14

foreign main proceeding if it is pending in the country where the debtor has the center of its main interests. *See* 11 U.S.C. § 1517(b).

31. For each of the reasons discussed in the Memorandum of Law, the Court should recognize each of the UK Proceedings as a foreign main proceeding because the Chapter 15 Petition, including this Verified Petition, satisfies all of the statutory requirements for recognition and related relief under chapter 15 of the Bankruptcy Code as a foreign main proceeding. First, the UK Proceedings are pending in the United Kingdom, the Debtors' COMI. Second, the Foreign Representative qualifies as a person or body, and is a foreign representative within the meaning of section 101(24) of the Bankruptcy Code. Third, this Chapter 15 Case was duly and properly commenced as required by sections 1504 and 1509(a) of the Bankruptcy Code by filing the Chapter 15 Petition, this Verified Petition, and all other required documents in accordance with section 1515 of the Bankruptcy Code.

**B.  Conclusion**

32. As described in the Memorandum of Law and above, this Court's recognition of the UK Proceedings is consistent with the purposes of chapter 15 of the Bankruptcy Code and with the public policy of the United States. Therefore, the Foreign Representative respectfully requests that the Court enter the Proposed Recognition and Enforcement Order and grant such other and further relief as the Court may deem just and proper.

**NOTICE**

33. No trustee, examiner or statutory committee has been appointed in these Chapter 15 Cases. Notice of this Motion will be provided to: (a) the Office of the United States Trustee for the Southern District of New York; (b) the United States Securities and Exchange Commission; (c) the Internal Revenue Service; (d) counsel to the Agent for the Secured

Noteholders; (e) ModSquad, Inc., and (f) the Debtors. The Foreign Representative also has provided notice of this Motion to the Electronic Mail Service Parties (as defined in the *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* (the "Notice Procedures Motion") via electronic mail to the extent the Foreign Representative is aware of the Electronic Mail Service Parties' electronic mail contact information. The Foreign Representative will provide notice of the entry of the order approving this Motion in the manner set forth in the Notice Procedures Motion, filed concurrently herewith. The Foreign Representative submits that such proposed notice and service to the parties contemplated therein constitute reasonable and proper notice under the circumstances, and that no other or further notice is necessary or required.

WHEREFORE, the Foreign Representative respectfully requests (i) entry of the Proposed Recognition Order, substantially in the form attached hereto as <u>Exhibit A</u>, and (ii) such other and further relief as the Court deems just and proper.

| | |
|---|---|
| Dated: New York, New York<br>December 20, 2016 | SIDLEY AUSTIN LLP<br><br> <u>/s/ Michael G. Burke</u><br>Michael G. Burke<br>Brian J. Lohan (*Pro Hac Vice* Pending)<br>Andrew P. Propps<br>787 Seventh Avenue<br>New York, New York 10019<br>Telephone:  (212) 839-5300<br>Facsimile:  (212) 839-5599<br>Email:  mgburke@sidley.com<br>            blohan@sidley.com<br>            apropps@sidley.com<br><br>*Counsel to the Foreign Representative* |

## VERIFICATION OF PETITIONER

I, Paul Cooper, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury:

1. I am a duly authorized foreign representative of Karhoo Inc. (in administration), Karhoo USA Inc. (in administration), Karhoo Limited (in administration), and Karhoo Technologies Limited (in administration) and as such am duly authorized to commence these Chapter 15 Cases, request the relief sought thereby and make this Verified Petition in these Chapter 15 Cases.

2. I have read the foregoing Verified Petition and I am informed and believe that the factual allegations contained therein are true and correct.

3. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of December 2016.

*(signed)* Paul C.

Paul Cooper, solely in his capacity as Foreign Representative of Karhoo Inc. (in administration), Karhoo USA Inc. (in administration), Karhoo Limited (in administration), and Karhoo Technologies Limited (in administration)