**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :

In re:                                                  :        Chapter 15

KARHOO INC. (in administration), *et al.*[1]    :        Case No. 16-13545 (___)

            Debtors in a Foreign Proceeding.   :        (Joint administration pending)

---------------------------------------------------------------x

**DECLARATION OF PAUL COOPER IN SUPPORT OF VERIFIED
PETITION FOR ENTRY OF AN ORDER RECOGNIZING FOREIGN
MAIN PROCEEDING AND GRANTING ADDITIONAL RELIEF,
AND OTHER RELIEF AND FIRST DAY PLEADINGS**

I, Paul Cooper, declare under penalty of perjury under the laws of the United States of America that the following is true and correct:

1.    I am a partner of David Rubin & Partners Ltd ("David Rubin & Partners"), 26-28 Bedford Row, London WC1R 4HE, United Kingdom. David Rubin & Partners is a restructuring firm that specialises in business turnaround and rescue, corporate and personal insolvency, forensic accounting, and litigation support. I am authorized under the provisions of Part XIII of the Insolvency Act 1986 (the "Insolvency Act") to act as an insolvency practitioner. My Insolvency Practitioner number is 15452, and I am licensed by the Institute of Chartered Accountants in England and Wales.

---

[1] The chapter 15 debtors incorporated in England and Wales (collectively, the "UK Debtors"), along with the English Company Number of each UK Debtor, are: Karhoo Limited (in administration) (09318091) and Karhoo Technologies Limited (in administration) (09864120). The chapter 15 debtors incorporated in the United States (collectively, the "US Debtors"), along with the last four digits of each US Debtor's federal tax identification number, are: Karhoo Inc. (in administration) (2445) and Karhoo USA Inc. (in administration) (3852). The UK Debtors and the US Debtors are referred to herein, collectively, as the "Debtors." The mailing address of each of the Debtors (and registered office of each of the UK Debtors) is 26-28 Bedford Row, Holborn, London, WC1R 4HE, United Kingdom.

2.  I submit this declaration (the "Declaration") in support of the *Verified Petition for Entry of an Order Recognizing Foreign Main Proceeding and Granting Additional Relief* (together with the Form of Voluntary Petition for each Debtor filed contemporaneously herewith, the "Petition")[2] and the following motions and other documents I have filed, through my counsel, contemporaneously herewith (collectively, the "First Day Pleadings"): (a) the *Foreign Representative's Motion for Entry of an Order Granting Limited Provisional Relief* (the "Provisional Relief Motion"); (b) the *Foreign Representative's Motion for an Order Directing Joint Administration of the Debtors' Chapter 15 Cases Pursuant to 105(a) of the Bankruptcy Code and Bankruptcy Rule 1015(b)* (the "Joint Administration Motion"); (c) the *Foreign Representative's Motion for Entry of an Order Authorizing the Filing of a Consolidated List of Foreign Proceeding Administrators, Litigation Parties, and Entities Against Whom 11 U.S.C. § 1519 Provisional Relief is Sought* (the "Consolidated Lists Motion"); and (d) the *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002 and 9007 for Order Scheduling Hearing and Specifying Form and Manner of Service of Notice, and Granting Related Relief* (the "Notice Procedures Motion").

3.  On November 9, 2016, as permitted by the Insolvency Act, I was appointed, along with Paul Appleton (managing partner of David Rubin & Partners) by the board of directors of each of the UK Debtors as administrator of both UK Debtors (in such capacity, the "UK Debtor Administrators").

4.  Later that day, each of the UK Debtors filed a notice of appointment of an administrator in the Chancery Division of the High Court of Justice of England and Wales (the

---

[2] Except as otherwise indicated, capitalized terms used herein carry the meanings ascribed to them in the Petition.

"English Court"), copies of which are attached hereto as Exhibit A and Exhibit B (each, a "UK Debtor Notice of Appointment").

5. On November 16, 2016, as permitted by the Insolvency Act, I was appointed, also along with Mr. Appleton, by the board of directors of each of the US Debtors as administrator of both the US Debtors (in such capacity, the "US Debtor Administrators" and, as administrators of all of the Debtors, the "Administrators").

6. On November 21, 2016, each of the US Debtors filed a notice of appointment of an administrator in the English Court, copies of which are attached hereto as Exhibit C and Exhibit D (each, a "US Debtor Notice of Appointment," and, together with the UK Debtor Notices of Appointment, the "Notices of Appointment").

7. I make this declaration on the basis of documentation I have reviewed and facts known to me through my work as administrator of the Debtors. Where relevant information has been provided to me by others, the information is true to the best of my knowledge and belief. If I were called upon to testify, I could and would testify competently to the facts set forth herein.

**I.    The Debtors' Business**

8. The Debtors are part of a group of companies ("Karhoo") that offered a "ride comparison app" as an alternative to the Uber/Lyft "ride-sharing app" model. Instead of maintaining its own fleet of drivers and cars, Karhoo contracted with local dispatchers and fleet owners, providing customers with a choice of vehicles and prices through its mobile application.

9. Founded in November 2014 in London, England, by Daniel Ishag (a resident of the United Kingdom), Karhoo is comprised of eight entities organized in five jurisdictions, as shown below:



10.     The US Debtors are incorporated in Delaware. The UK Debtors and non-debtor Karhoo Holding Ltd (collectively, the "English Entities") are organized under the laws of England and Wales. Karhoo Asia Limited is organized under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, Karhoo Singapore PTE. LTD. ("Karhoo Singapore") is organized under the laws of the Republic of Singapore, and Karhoo Solutions Israel Ltd ("Karhoo Israel," and together with Karhoo Asia Limited and Karhoo Singapore, the "Asian Entities") is organized under the laws of the State of Israel. Each of the entities, other than Karhoo Inc., is a wholly owned direct or indirect subsidiary of Karhoo Inc. and each entity shown above it on the above chart.

11.     A customer looking for a ride through the mobile app on her phone would potentially see several vehicles along with the fleet they belong to (such as Dial 7 or Carmel), the estimated time of arrival, and the fare; she could also filter by the fleet type (such as taxi,

4

executive, or luxury) before choosing her ride. The intellectual property that enables this to take place – including Karhoo's electronic infrastructure, its mobile app, and the back-end software – is owned by one of the UK Debtors, as is its other intellectual property, such as its trademarks (collectively, the "Karhoo IP"). The Karhoo IP was first registered in England and Wales, and then in other jurisdictions, including the United States. The Karhoo IP was licensed by the UK Debtors to the other Karhoo entities, including the US Debtors.

12.     In order to procure vehicles for its customers, Karhoo entered into approximately 700 contracts with fleet owners (the "Supplier Contracts") and approximately 21 contracts with dispatchers (the "Dispatch Contracts") in the cities in which it did business, primarily London and several other cities in England. Under the Supplier Contracts, the fleet owners made their fleets available to Karhoo's customers; the Dispatch Contracts allowed Karhoo to communicate customer instructions to those fleets through local dispatchers. The US Debtors entered into the majority of Karhoo's Supplier Contracts and Dispatch Contracts, but the business relationships with non-U.S. counterparties generally were with the English Entities. The Supplier Contracts and Dispatch Contracts generally are governed by the law of the place of business of the counterparty, including England, New York, France, and Singapore.

13.     Karhoo accepted credit card payments from its customers through Stripe, which automatically paid fleet owners and dispatchers the amounts due to them (typically 90%) and the remainder to Karhoo; however, I believe that Karhoo owes an unknown amount under certain of the Supplier Contracts. Over 90% of Karhoo's revenue originated in the United Kingdom, with the payments through Stripe being paid to Karhoo USA Inc.

14.     In total, Karhoo employed approximately 200 employees, the vast majority of whom have been laid off or made redundant in recent weeks. Of those employees,

5

approximately 100 were employed by the UK Debtors. Approximately 50 were employed by the US Debtors (about a dozen of whom resided in the United Kingdom and worked as part of Karhoo's global leadership), and the remainder were employed by the Asian Entities. Monthly payroll roughly followed the same distribution. As of November 9, 2016, the US Debtors owed approximately $375,428.31 to their employees, and the UK Debtors owed approximately $1,538,496.89 to their employees.

15. Karhoo's business and operations were directed out of London. Its executives – including its chief executive officer ("CEO"), chief financial officer ("CFO"), chief marketing officer ("CMO"), and chief technology officer ("CTO") – as well as the chairman of the board of directors are based in London. Karhoo's accounting team is primarily in the United Kingdom, including its global controller, its global accounts payable head, the bulk of its fraud team, its payments team, and the group head of financial projects. Karhoo's human resources functions, including the global head of human resources and the global technology recruiter, are also based in London. Karhoo's information technology systems are cloud-based, but those services are arranged by and billed to Karhoo Ltd. Recent meetings of the boards of directors of the US Debtors and the English Entities have been telephonic, with one director in England, one in Europe, and one in the United States.

16. On January 7, 2016, Karhoo Inc. entered into a 10-year lease for office space at 386 Park Avenue South, New York, New York. The lease commenced on July 15, 2016. Annual rent was to be $859,584 for the first year, increasing over time to over $1.1 million for the tenth year. As security for Karhoo Inc.'s obligations under the lease, Karhoo Inc. delivered to its landlord a letter of credit issued by HSBC Bank USA, N.A. in the amount of $859,584 (the "HSBC L/C"), which was fully cash-collateralized by Karhoo Inc. Upon my appointment, I

6

undertook a negotiation to terminate the lease and surrender the premises to the landlord.  Prior to filing these cases, I executed an agreement surrendering the leased office space to the landlord in exchange for the return of $60,000 of the HSBC L/C collateral (which return has not yet occurred).

17.    Other than amounts owed to their employees, described *supra* ¶ 14, and to the Secured Noteholders, described *infra* ¶ 18, as of November 9, 2016, the US Debtors owed approximately $2,931,154.58 to their creditors.  Other than amounts owed to their employees and affiliates, as of November 9, 2016, the UK Debtors owed approximately $4,411,925.52 to their creditors.  (In addition, non-debtor Karhoo Singapore owes approximately $261,000 to its creditors.)

## II.    The Debtors' Capital Structure/Events Leading to Administration

18.    The Debtors have no public securities.  It is my understanding that the Debtors' (and Karhoo's) only funded debt is approximately $18 million in Secured Convertible Term Notes due March 11, 2017 (the "Secured Notes") under that certain Securities Purchase Agreement among Karhoo Inc., the Purchasers thereunder, and DNK USA, LLC as administrative and collateral agent (the "Agent") for the Purchasers dated October 11, 2016 (the "Securities Purchase Agreement"), of which debt the Administrators will confirm the validity in the normal course of their duties.  Karhoo Inc. purportedly granted a security interest in its assets to the agent for the holders of the Secured Notes (the "Secured Noteholders"), of which security interest the Administrators also will be required to confirm the validity in the event that Karhoo Inc.'s assets are sold and distributions to creditors are effected.  Karhoo USA Inc. guaranteed Karhoo Inc.'s obligations under the Securities Purchase Agreement.  There are four purported Secured Noteholders:

| Secured Noteholder | Domicile of Secured Noteholder | Amount |
|---|---|---|
| Hard Work Israel Holding Trust | Israel | $9,127,666.67 |
| Jeremy Coller | United Kingdom | $5,040,000.00 |
| DNK USA, LLC | Delaware, United States | $3,000,000.00 |
| Wottan Holdings Limited | Switzerland | $1,000,000.00 |

19. My counsel provided the Agent and the Office of the United States Trustee with advanced drafts of my filings with this Court. To date, I am aware of no objection to the relief being sought in connection with the filing.

20. A total of 100,691,318 shares of Karhoo Inc. are outstanding, the sale of which had generated approximately $33.65 million in capital for Karhoo, in six (6) rounds of sales. (Certain financial press had reported a cash raise of $250 million; those reports appear to have been mistaken.) 35.65% of the shares are held, directly or indirectly (including through Powerful Ace Ltd.), by Daniel Ishag. Other co-founders of Karhoo, all UK residents, hold 21.35%. The remaining 42.99% of the shares are held by several dozen investors.

21. Since its founding, Karhoo aggressively marketed itself, seeking both a larger share of the market in the cities it operated in and a larger number of cities in which to operate. Karhoo expanded from its London roots to nine (9) other English cities, New York (where Karhoo was at a pilot stage), Paris, and Singapore, and had plans to operate in another twenty-nine (29) cities worldwide, including other major population centers in Europe and the United States, by the end of 2016. Karhoo expected to be in 400 cities by the end of 2020. This expansion and marketing would require significant amounts of capital.

22. However, Karhoo encountered a number of difficulties that proved to be insurmountable. These difficulties included the misuse and misaccounting of promotional codes (often for rides of up to $40), which were given out indiscriminately, which users would often use for the most expensive trip possible, and which Karhoo permitted users to re-use. In October

8

2016, approximately 70% of Karhoo's bookings were using promotional codes. Similarly, in an effort to retain users, Karhoo was generous with its refunds and other compensation for poor experiences.

23. In October 2015, Karhoo Inc. contracted with ModSquad Inc. ("ModSquad") to provide customer support services to Karhoo. On October 28, 2016, ModSquad commenced a breach of contract lawsuit against the Debtors in the United States District Court for the Southern District of New York, alleging that it is owed over $670,000 for services rendered through October 2016 and for the remainder of the term of a certain work order under the parties' contract.

24. Karhoo also had problems with the fraud protections in its payment processing system, such as verifying a user's address or requiring an email address to set up an account, leading to the rejection of many credit card payments (at one point, reportedly reaching a 90% rejection rate).

25. Beginning around the beginning of October, many of Karhoo's employees began working without pay in an attempt to turn around the business. At the end of October, Karhoo missed payroll in both the United States and Israel; on November 6, 2016, Karhoo Israel had to put its employees in the Israeli R&D Center on notice of termination.

26. In the meantime, Karhoo actively was seeking an infusion of outside capital (in addition to the capital raised through the sale of the Secured Notes), with company representatives courting investors on multiple continents; by November 7, 2016, the focus was on one particular investor who was being provided reassurances about the state of Karhoo's business, and who would not have the opportunity to do due diligence. Karhoo's management expressed a willingness to put $600,000 into Karhoo if the investment were procured. However,

9

Karhoo's operational difficulties made the investor wary, and on November 7, 2016, the investor declined to invest in Karhoo, leaving Karhoo with no alternative investor and insufficient funds with which to operate.

27. In the final week of Karhoo's operations, given Karhoo's high media profile, a number of press articles appeared commenting on, and speculating on the reasons for, its demise. As Administrator, I intend to fulfill my statutory duties under the Company Directors Disqualification Act 1986 by investigating the Debtors' circumstances in the months leading up to the Debtors' entry into administration and submitting reports to the Department for Business, Energy, and Industrial Strategy of the UK Government.

### III.    The Administration

28. In light of Karhoo's difficulties, on November 7, 2016, the boards of directors of the UK Debtors determined it was necessary to cease operations and enter administration so as to maximize the value of Karhoo's assets. This led to my and Paul Appleton's appointment as the UK Debtor Administrators, as described *supra* in paragraphs 3 and 4, on November 9, 2016.

29. In the board minutes memorializing the decision to appoint the UK Debtor Administrators and enter administration (which minutes are attached hereto as Exhibit E (Karhoo Limited) and Exhibit F (Karhoo Technologies Limited)), the directors "noted that the Company's registered office is in the United Kingdom, and in accordance with the presumption contained in Article 3(1) of [Council Regulation (EC) No. 1346/2000 on Insolvency Proceedings] (absent any evidence to the contrary) were satisfied that its centre of main interests should be presumed to be and is in the United Kingdom." Ex. E ¶ 6.3; *see also* Ex. F ¶ 6.3. The UK Debtor Notices of

10

Appointment repeated this reason for centre of main interests ("COMI") to be in the United Kingdom. *See* Exs. A and B.

30. In the minutes of the meeting in which the boards of directors determined to appoint the US Debtor Administrators (which minutes are attached hereto as Exhibit G (Karhoo Inc.) and Exhibit H (Karhoo USA Inc.)), they concluded that:

i. The Group's Headquarters and the place where general supervision and management of the Company takes place is London, United Kingdom;

ii. The Company's place of strategic control is in the United Kingdom, with the CEO, CFO, CMO CTO and Chairman all being based in the United Kingdom;

iii. The Company's address for the purpose of the Securities Purchase Agreement . . . and associated documents, was notified to the parties to such agreements as 6th Floor, 55 Baker Street, London W1U 8EW;

iv. The purchasers and current holders of the Secured Convertible Term Notes issued pursuant to the Securities Purchase Agreement are based or resident in various places, including the United Kingdom, Monaco and the United States, and as such the majority of the creditors of the Company by value are not based in the United States;

v. The Group's accounting function is in the United Kingdom, with the Group CFO, Group Financial Controller, Global AP head, most of the Fraud team, the payments team (PSP), and the Group Head of financial projects, all based in the United Kingdom;

vi. The Company's human resources functions are based in the United Kingdom;

vii. The Company's IT systems were provided by Karhoo Limited, which was based in the United Kingdom;

viii. The corporate identity and branding of the Group was created in and is largely associated with the United Kingdom;

ix. The recent board meetings have not been held in any particular place, with one director being in the United Kingdom, one in the United States, and one in Europe;

x. Negotiations with the Company's main creditors, being the [Secured Noteholders], have however taken place from London, and as such those creditors were clearly able to ascertain the Company's place of strategic control as being in the United Kingdom; and

  xi.  In addition, over 90 per cent of the Group's turnover was generated in the United Kingdom.

Ex. G ¶ 6.3. The minutes of Karhoo USA Inc. differed slightly, including the addition to ¶ 6.3(d) that the Secured Convertible Term Notes were "guaranteed by Karhoo USA Inc." *See* Ex. H ¶ 6.3.

  31. Therefore, the directors of each Debtor concluded that the Debtor's COMI was in the United Kingdom, and in the US Notices of Appointment, the directors of the Debtors stated that "[n]otwithstanding that the company is incorporated under the laws of the State of Delaware, the place where the company conducts the administration of its interests on a regular basis and is therefore ascertainable by third parties is in England." Ex. C; *see also* Ex. D. Therefore, for the purposes of the EC Regulation, the US Debtors' directors determined that the UK Proceedings also would be main proceedings with regard to the US Debtors.

  32. We have marketed Karhoo's assets as a whole, believing that due to the interdependence of the Karhoo entities' operations, assets, and liabilities, their assets were likely worth more marketed as a unit rather than piecemeal, and selected a single winning bidder, Flit Technologies Limited ("Flit Technologies"). Flit Technologies is purchasing substantially all of the Debtors' assets, including the Karhoo IP (primarily owned by the UK Debtors) and the Supplier Contracts and Dispatch Contracts (primarily entered into by the US Debtors), in exchange for the payment of (i) $500,000 cash in consideration for the assets of the UK Debtors, (ii) ten percent (10%) of the equity in Flit Technologies in consideration for the assets of the US Debtors, and (iii) up to $500,000 cash essentially as cure payments to the counterparties under certain Supplier Contracts that Flit Technologies is assuming (the "Sale"). We anticipate the Sale closing prior to the end of 2016.

**FIRST DAY PLEADINGS**

33.  In furtherance of these objectives, I have filed, through my counsel, contemporaneously herewith a number of First Day Pleadings and proposed orders, including the exhibits thereto, and the facts set forth therein are true and correct to the best of my knowledge, information, and belief.

### I.  Joint Administration Motion

34.  I have filed a motion to jointly administer the Chapter 15 Cases. I believe joint administration is warranted in these cases. The Debtors are affiliated entities with closely-related financial affairs and business operations, and joint administration will ease the administrative burden on the Court and the parties. I anticipate that the various notices, motions, hearings, orders and other pleadings in these cases will affect each of the four (4) affiliated Debtors. The failure to administer these cases jointly would result in duplicative pleadings filed for each issue and service of substantially identical pleadings. Such unnecessary duplication would impose avoidable expenses on all parties and unnecessarily burden the Clerk of the Court. Further, the supervision of the administrative aspect of these cases by the United States Trustee for the Southern District of New York will be simplified through joint administration.

35.  Joint administration will permit this Court to use a single docket for the jointly-administered cases and combine notices to certain of the Debtors' creditors and other parties in interest of the Debtors. Joint administration will protect parties in interest by ensuring that they will be appropriately apprised of all matters before the Court for each of the Debtors. Requiring separate administration of the Chapter 15 Cases would subject me (in my capacity as the Foreign Representative) and potential creditors to substantial administrative burden, and could distract the Administrators at a time when taking action to maximize the Debtors' assets is

critical. Accordingly, I believe entry of an order granting the relief requested in the Joint Administration Motion is in the best interest of the Debtors and all parties in interest.

## II. Consolidated Lists Motion

36. To ease the administrative burden of these cases on the parties, I (in my capacity as the Foreign Representative) am seeking authorization to file in the Debtors' main case a consolidated list of foreign proceeding administrators, parties to litigation pending in the United States in which any of the Debtors is a party, and all entities against which I (in my capacity as the Foreign Representative) seek provisional relief under section 1519 of the Bankruptcy Code. The Debtors presently maintain, on a consolidated basis, various lists that contain nearly all of the requisite data. I believe that these lists may be consolidated and utilized efficiently to provide interested parties with the information required by Bankruptcy Rule 1007(a)(4). Accordingly, I am seeking authority to file such consolidated list. I believe that the relief requested serves the interests of efficiency and conserves the resources of all parties in interest.

## III. Provisional Relief Motion

37. By the Provisional Relief Motion, I request the application of section 362 of the Bankruptcy Code on an interim basis until the hearing on recognition takes place. As explained more fully in the Provisional Relief Motion, absent such preliminary relief pending the Court's determinations with respect to recognition of each of the UK Proceedings as a "foreign main proceeding," the Debtors could face immediate and irreparable harm resulting from (a) the continuation of the ModSquad Lawsuit, (b) the termination of the Debtors' Supplier Contracts and Dispatch Contracts, many of which permit a counterparty to terminate its contract for "Cause," typically including the Debtor's uncured breaches of the contract and/or the Debtor's

14

16-13545-mkv    Doc 4    Filed 12/20/16    Entered 12/21/16 00:02:15    Main Document
Pg 15 of 18


insolvency, and (c) attempts by other parties to attach the Debtors' assets with the purpose of providing themselves priority over the Debtors' other creditors.

38. The Debtors engaged in operations in the United States and have U.S. creditors in the form of Secured Noteholders (whose Secured Notes are governed by New York law), employees, professionals, and vendors (including ModSquad). While I believe the Secured Noteholders do not oppose the relief I have sought in this Court, other creditors may or may not be supportive, and without the protections sought in the Provisional Relief Motion, those creditors may take actions against the Debtors or their property, including the prosecution of lawsuits or the attachment of the Debtors' property. Furthermore, the Debtors' counterparties under the Supplier Contracts and Dispatch Contracts have termination rights under those contracts that they may seek to exercise, and without the protections sought in the Provisional Relief Motion, should such contracts be terminated, the Debtors would lose important rights and benefits under the contracts, to the detriment of the Debtors' businesses and, in turn, their creditors.

39. The failure to promptly enjoin creditor or counterparty actions would result in a significant disruption to the value of the Debtors' assets if their creditors could commence any actions in the United States or by terminating U.S. contracts. If collection and enforcement actions or contract terminations occurred in the United States, the Debtors would be forced to expand their resources to defend against these suits and/or purported contract terminations, regardless of their merit, and may be forced to expend limited resources in defense of collection actions or attachment by individual creditors. The termination of the Supplier Contracts and Dispatch Contracts, in particular, likely would impact the value of the Debtors' other assets, which are co-dependent on those contracts for their value. Absent the relief

requested, if creditors unilaterally pursue collection or enforcement efforts or seek to terminate contracts, it could diminish the value of the Debtors' assets and cause significant delay and disruption to the Debtors' marketing and sale process.

40. Accordingly, based on the foregoing, I urge the Court to grant the relief requested in the Provisional Relief Motion, as I believe such relief to be vital to a successful administration of the Debtors, and in the best interests of the Debtors and their creditors generally.

### IV. Notice Procedures Motion

41. I (in my capacity as the Foreign Representative) have filed the Notice Procedures Motion seeking an order (a) setting (i) the date and time for the hearing for the Court to consider the Petition (the "Recognition Hearing Date") and (ii) the deadline by which responses or objections to the Petition must be received, (b) approving the form, and manner of service, of notice of (i) the Recognition Hearing Date and (ii) the Court's entry of any order granting the relief sought in the Provisional Relief Motion (the "Provisional Relief Order"), and (c) approving the manner of service of further filings I may make.

42. The Debtors have certain creditors, potential creditors, and other parties in interest that must be provided with, among other things, notice of the Provisional Relief Order, the deadline to object to the proposed Recognition Order, and the hearing on the proposed Recognition Order. Under the facts and circumstances of the UK Proceedings and Chapter 15 Cases, it is my belief that service of the notice in the manner proposed in the Notice Procedures Motion will provide the Debtors' various parties in interest due and sufficient notice and service of such matters and any associated objection deadline and hearing dates. I believe that the proposed form and manner of service of notice outlined in the Notice Procedures Motion is an

efficient and effective way to provide notice to key parties, and will not burden the me (in my capacity as the Foreign Representative) or the Debtors and their estates with the significant costs necessarily associated with copying and mailing various documents to hundreds of parties, while making those documents available in hard copy upon request.  Accordingly, I believe entry of an order granting the relief requested in the Notice Procedures Motion is in the best interests of the Debtors and all parties in interest.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Based on the foregoing, I believe that the relief requested in the Chapter 15 Cases is well-justified, necessary to a successful administration of the Debtors, and in the best interests of the Debtors and their creditors and should be granted in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: December 20, 2016
London, United Kingdom

/s/ Paul Cooper
_____
Paul Cooper

Foreign Representative for Karhoo Inc. (in administration), Karhoo USA Inc. (in administration), Karhoo Limited (in administration), and Karhoo Technologies Inc. (in administration)

26-28 Bedford Row
London WC1R 4HE
United Kingdom

Declaration of Foreign Representative Paul Cooper – Signature Page